**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

KEITH JONES,

        **Plaintiff,**

                                **Case No. 2:09-CV-1120**
      **v.**                         **JUDGE GREGORY L. FROST**
                                  **Magistrate Judge Mark R. Abel**

STÄUBLI MOTOR SPORTS DIVISION OF
STÄUBLI AMERICAN CORPORATION, et al.,

        **Defendants.**

**and**

FEDERAL INSURANCE COMPANY,

        **Plaintiff,**             **Case No. 2:10-cv-0037**
                                  **JUDGE GREGORY L. FROST**
                                  **Magistrate Judge Mark R. Abel**
   **v.**

STÄUBLI MOTOR SPORTS, et al.,

        **Defendants.**

**<u>ORDER</u>**

These consolidated cases are before the Court on the motions for summary judgment

filed by Defendant Staübli America, Inc., in Case No. 2:09-cv-1120, and Defendants Staübli

America, Inc., and Staübli Corporation in Case No. 2:10-cv-37 (collectively, "Staübli").  (ECF

No. 120 in Case No. 2:09-cv-1120 and ECF No. 106 in Case No. 2:10-cv-37.)  Also before the

Court are the memoranda in opposition to summary judgment of Plaintiff Keith Jones (ECF No.

1

142 in 2:09-cv-1120) and Plaintiff Federal Insurance Company (ECF No. 116 in Case No. 2:10-cv-37), and Staübli's reply memoranda (ECF No. 156 in 2:09-cv-1120 and ECF No. 120 in Case No. 2:10-cv-37).  For the reasons that follow, the motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**.  Though the Court finds that Staübli is entitled to summary judgment on some of the claims asserted in the Plaintiffs' complaints, there are genuine issues of material fact that preclude summary judgment on product liability claims brought under the Ohio Product Liability Act.

## I.   Background

This case arises from an accident that occurred on July 19, 2008, in the pit area of the Mid-Ohio Racetrack during an American LeMans Racing Series race.  Plaintiff Keith Jones worked as a refueler for the pit crew of the de Ferran Motorsports racing team.  Thinking that the refueling process was complete during a fuel-only pit stop during the race, the pit crew chief implored the de Ferran Motorsports driver to pull out of the pit area and rejoin the race.  Unfortunately, at the time the car pulled away, Jones had not yet disconnected the fuel probe from the car.  The fuel hose broke and spilled fuel, which ignited into a fire that severely injured Jones.  Jones contends that the fueling system manufactured by Defendant Staübli was defective.

### A.   The Staübli SAF Device

In the early 2000s, Defendant Staübli designed a two-part fueling system, dubbed the Staübli Advanced Filling ("SAF") system, for use in auto racing.  The main goal of the SAF was to prevent fuel spillage and therefore reduce the risk of fire during the refueling process.  The SAF consists of (1) the socket, which is attached to a fuel probe and hose that in turn connects to

the fuel source, and (2) the plug (also called the "buckeye" in racing parlance), which is attached to the car.  Staübli obtained a patent for the SAF and began marketing the system in 2003. Today, the SAF is used by racing teams in various auto racing series around the world.

To operate the SAF, the fueler holds the socket by its two handles and connects it to the plug on the car.  The fueler then pushes down on the handles, causing the socket to lock onto the plug, which in turn allows fuel to flow into the car.  The SAF is designed such that the sequencing of the operation prevents fuel leaks.  The SAF is also designed to make it easy for the fueler to decouple the socket from the plug once the fueling process is complete.

To remove the socket when the fueling is complete, the fueler must simply release pressure on the handles.  As the SAF system is designed, releasing the handles stops the flow of fuel and also disconnects the socket from the plug.  The ease of disconnecting the socket from the plug is a key safety feature of the SAF: the handles of the socket have springs in them that help push the socket off the plug when the fueler releases the handles.  Thus, when refueling is complete during a pit stop, the fueler can simply guide the fuel hose away from the car as the SAF socket releases itself.

In marketing literature, Staübli described the SAF as featuring a "[s]afe and reliable connection" and being "easy to operate."  The literature also touted a "'dead man principle' function" that allowed easy release when the handles were released.  Staübli also touted that its socket design "prevents any jamming during connection to or disconnection from the plug." There is testimony in the record indicating that race pit crew teams relied upon the quick disconnect feature of the SAF, such that they timed the restart of the race car after refueling based upon the movement of the fueler away from the car.

**B.     The Accident**

On July 19, 2008, Jones was the refueler for the de Ferran Motorsports pit crew during an American LeMans Racing Series race at the Mid-Ohio Raceway.  When the de Ferran Motorsports car came in for a refueling stop, Jones attached the SAF socket to the plug with two hands to begin the refueling process.  After coupling the socket and plug, Jones removed his left hand from the handle and held down only the socket's right handle; with his left hand, Jones held the fuel hose in a raised position.  (Jones Dep. 170-171, ECF No. 105.)[1]  Jones testified at his deposition that he refueled the car this way (*i.e.* holding the socket with one hand and the hose with the other) to remove "sag" from the hose and increase the speed of the fuel flow.  (*Id.* at 171.)  A Staübli engineer testified that operating the SAF in this manner should not have affected the ease of disengaging the socket from the plug once the fueling was complete.  (Tiberghien Dep. 63, ECF No. 115.)

When he was finished refueling the car, Jones released the pressure on the socket handle in order to release the socket.  But on this occasion, the socket did not disconnect from the plug.  Jones then placed his left hand on the left handle and tried to remove the socket using both hands.  Again, however, the socket did not disconnect.  Thus, after two attempts to disconnect, the SAF socket (and therefore the fuel hose) remained connected to the race car.

Unfortunately for Jones, his body turned away from the car during one of his attempts to disconnect the SAF socket from the plug.   Based on this movement, pit crew chief John Anderson signaled the driver to go and pit crew member Steve Regan followed suit by lifting the

---

[1]Unless otherwise specified, ECF references will be to the docket in Case No. 2:09-cv-1120.

"lollipop" stop sign that he held in front of the driver.  The driver pulled forward with the fuel

hose still attached to the car.  As a result, the hose broke, causing fuel to spill onto Jones.  Heat

from the car's exhaust ignited the fuel, setting Jones on fire.  Another de Ferran Motorsports

crew member and members of other race teams extinguished the fire, but not before Jones

suffered third-degree burns to his hands, forearms, face, head, legs, and feet.

At the time of the accident, Jones was wearing a fire-resistant jacket and fire-resistant

pants that protected his torso from the fire.  Jones was also wearing a balaclava (a cloth headgear

resembling a ski mask) and helmet to protect his head and face.  Jones did not, however, wear

fire-resistant shoes or gloves even though they were provided to him by de Ferran Motorsports.

According to Jones, the fire-resistant shoes fit poorly due to the width of his feet and the fire-

resistant gloves were too bulky such that they gave Jones "an unsafe feeling for the handles on

the fuel probe."  (Jones Dep. 129, ECF No. 104.)  Instead of fire-resistant shoes and gloves,

Jones wore ordinary tennis shoes and a "regular pair of Mechanix Wear gloves" on the day of

the race.  (*Id.* at 130.)

### C.      Inspection and Disposal of the SAF at Issue

After learning of the accident that injured Jones, Staübli asked de Ferran Motorsports if it

would return the subject SAF for inspection.  de Ferran Motorsports agreed and gave the SAF to

a Staübli representative.  The SAF was eventually shipped to Staübli's facility in Faverges,

France for inspection.  Staübli's Quality Department in Faverges inspected the SAF and prepared

a written report, which concluded that it was "impossible" to determine the cause of the

disconnection failure experienced by Jones at the time of the accident.  After inspection, the SAF

parts were stored on a shelf in the "After Sales Department" of the Staübli facility in Faverges,

6

France.  (Mayeur Dep. 12-15, ECF No. 152.)  At some unknown time, however, the SAF parts were discarded.  As a result, the SAF that failed at the time of the accident in this case is not available for Plaintiffs' inspection, nor is it available to be introduced as evidence in this case.

Despite being unable to determine why the SAF did not disconnect for Jones at the time of the accident, Staübli representatives familiar with the product acknowledge that a properly functioning SAF socket should have come off easily once Jones released pressure on the handles.  For example, Staübli Motorsports Manager Jeff Barrow wrote in an e-mail to de Ferran Motorsports just two days after the fire, "I saw the video of the fire and it sure looks like the socket stuck on the car?  This should not happen once handle pressure is released.  It should kick back and just fall off."  (Barrow Dep. Ex. 16, ECF No. 139.)  Similarly, Alain-Christophe Tiberghien, an engineer and the head of Staübli's connectors research and development department, testified at a Fed. R. Civ. P. 30(b)(6) deposition that the SAF did not operate as designed or intended at the time of the accident: the SAF socket should have released from the plug.  (Tiberghien Dep. 60-61, 102-105, ECF No. 115.)

### D.    The Lawsuits

Jones commenced the lawsuit in Case No. 2:09-cv-1120 in December 2009.  Jones's Amended Complaint named Staübli Motor Division of Staübli America Corporation and eight other defendants who were alleged to have played some role in causing the injuries suffered by Jones.  (Am. Compl., ECF No. 48.)[2]  On motion of the parties, all defendants but Staübli were

---

[2]Staübli America, Inc. answered as the Defendant in Jones's lawsuit and is the party that moves for summary judgment, noting that it was incorrectly named "Staübli Motor Sports Division of Staübli America Corporation" in the Amended Complaint.  (Answer to Am. Compl. 1, ECF No. 53; Mot. Summ. J. 1, ECF No. 120.)  At this juncture, the parties do not appear to dispute that Staübli America, Inc., is properly before the Court as the correct party defendant.

later dismissed with prejudice pursuant to an extrajudicial settlement of claims against those defendants.  (Order, ECF No. 134.)  As to Staübli, the Amended Complaint alleges claims for product liability under the Ohio Product Liability Act (Count 1), negligence (Count 2), and gross negligence/willful and wanton misconduct (Count 7).

Plaintiff Federal Insurance Company ("Federal") commenced the lawsuit in Case No. 2:10-cv-37 in January 2010.  Federal's Third Amended Complaint named as defendants Staübli Motorsports, Staübli America Corporation, and nine other defendants (including many of the same parties named in Jones's lawsuit).[3]  (Third Am. Compl., ECF No. 75 in Case No. 2:10-cv-37.)  The gravamen of Federal's claim is that it issued a comprehensive workers compensation insurance policy to Jones's employer, de Ferran Motorsports, and that it was entitled to recoup from defendants the total sum of $483,298.06 paid to or on behalf of Jones.  (*Id.* at ¶ 28.)  As relevant to Staübli, Federal's Third Amended Complaint alleges claims for product liability under the OPLA, misrepresentation, and negligence.  (*Id.* at ¶¶ 30-46.)  In the same Order dismissing all defendants but Staübli from Jones's lawsuit, all defendants in Federal's lawsuit but the Staübli defendants were likewise dismissed with prejudice.  (Order, ECF No. 115 in Case No. 2:10-cv-37.)

As a result of the dismissal of other defendants in this case, the Staübli defendants are the only defendants remaining in both the Jones and Federal Insurance lawsuit.  Staübli moves for

---

[3]Staübli Corporation and Staübli America, Inc., answered the Federal Insurance complaint, noting that they were incorrectly sued as "Staübli Motor Sports" and "Staübli America Corporation," respectively.  (Answer 1, ECF No. 53 in Case No. 2:10-cv-37.)  Staübli Corporation and Staübli America, Inc., are the summary judgment movants in Case No. 2:10-cv-37.  (Mot. Summ. J. 1, ECF No. 106 in Case No. 2:10-cv-37.)  At this juncture, the parties do not appear to dispute that Staübli Corporation and Staübli America, Inc., are properly before the Court as the correct party defendants in Case No. 2:10-cv-37.

summary judgment in both lawsuits and those motions are ripe for this Court's consideration.

## II.    Summary Judgment Standard

Defendant Staübli seeks summary judgment in its favor under Fed. R. Civ. P. 56 on both Jones's and Federal Insurance's complaints.  Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the moving party, Staübli has the initial burden of proving that no genuine issue of material fact exists; the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Stansberry v. Air Wisconsin Airlines Corp*., 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted).

If the moving party meets its initial Rule 56 burden, the nonmovant must "designate specific facts showing that there is a genuine issue for trial" in order to escape summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "The nonmovant must, however, 'do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Lee v. Metro. Gov't of Nashville & Davidson Cnty*., 432 F. App'x 435, 441 (6th Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1984)).  "[T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a 'genuine' dispute."  *Id.*

### III.   Discussion: Jones's Lawsuit (Case No. 2:09-cv-1120)

##### A.   Assumption of Risk by Virtue of Release

As an initial matter, Staübli contends that Jones's claims are barred as a matter of law because he "expressly assumed the risk of his injuries."  (Def.'s Mot. 12, ECF No. 120.)  Such risk was "assumed," Staübli argues, by virtue of Jones having signed an "annual release and waiver of liability" for the 2008 International Motor Sports Association ("IMSA") racing season, as well as similar release agreements with the Indy Racing League ("IRL").  (*Id.* at 7.)   Staübli also notes that Jones's IMSA credential, which allowed him access to the pit area, set forth Jones's agreement to "assume ALL RISKS of property damages, bodily injury, death, and all other hazards related in any way to any IMSA event."  (*Id.* (citing Jones Dep. Exh. 17).)

Staübli's "assumption of risk" theory based on Jones's execution of releases and waivers is without substantive merit in this case.  While Jones may have released certain entities and persons from liability, he did *not* release *Staübli* from liability in any of the various waivers and releases he signed.  Simply because Jones may have released organizations such as IMSA or IRL from liability does not mean he is precluded from pursuing a products liability action against Staübli for an allegedly defective product that caused him bodily injury.  *See Curtis v. Hoosier Racing Tire Corp.*, 299 F. Supp. 2d 777, 784 (N.D. Ohio 2004).

*Curtis* is instructive here.  In that case, the plaintiff was an experienced race car driver who was seriously injured after a tire blowout during a race caused him to crash.  The defendant, Hoosier Racing Tire Corporation ("Hoosier"), was a "promoter," "sponsor," and "advertiser" of the race in question and contracted with the racing series to be the exclusive supplier of racing tires for the cars in the race.  As a condition of participating in the race, the plaintiff signed a

release agreement that expressly released and waived all claims to liability against, among others, "promoters," "sponsors," and "advertisers" associated with the event.  *See id.* at 779. Similar to Staübli in this case, Hoosier argued there that the plaintiff's waiver and release agreement entitled it to summary judgment.

The district court rejected Hoosier's argument and denied summary judgment.  Even though Hoosier was released from liability as a "promoter," "sponsor," or "advertiser" of the race, the plaintiff did *not* release Hoosier from liability for providing a defective product; nor did the plaintiff assume the risk of being provided with a defective product.  *Id.* at 782-83.  While the plaintiff certainly knew of the risks inherent in auto racing, including the risk that a tire blowout could cause a crash, there was a material dispute as to whether the plaintiff had reason to know that the tire in question posed a risk of harm *because it was defective*.  *Id.* at 784.  The waiver and release did not extend to that risk.  *Id.  See also Mohney v. USA Hockey, Inc.*, 5 F. App'x 450, 458-59 (6th Cir. 2001) (reversing summary judgment in favor of manufacturers of hockey helmet and facemask; release signed as to the amateur hockey association, hockey league, and the hockey club did not, as a matter of law, release product liability claims against manufacturers of allegedly defective equipment) (applying Ohio law).

In this case, Staübli's arguments for coverage under the waivers and releases signed by Jones are even weaker than Hoosier's argument in *Curtis*.  Staübli makes no argument as to how it falls within the definition of the releasees included in any of the waiver and release agreements it tries to invoke in this case.  Rather, Staübli apparently takes the position that Jones's general release of claims for bodily injury extends to product liability claims against it, regardless of whether the releases included Staübli as a released party.  Ohio law does not extend as far as

Staübli would have this Court extend it.  *See Holmes v. Health & Tennis Corp. of Am.*, 103 Ohio App. 3d 364, 367, 659 N.E. 2d 812 (1995) (noting that a release can constitute an "express assumption of risk" only when the agreement states a clear and unambiguous intent to release a party from liability).

For the foregoing reasons, Staübli is not entitled to summary judgment on an "assumption of risk" theory based on Jones's execution of waiver and release agreements with other parties.

### B.     Product Liability: Existence of a Defect

The OPLA provides generally that a manufacturer is subject to liability if a plaintiff establishes, by a preponderance of evidence, that the manufacturer's product in question "was defective in manufacture or construction as described in section 2307.74 of the Revised Code, was defective in design or formulation as described in section 2307.75 of the Revised Code, was defective due to inadequate warning or instruction as described in section 2307.76 of the Revised Code, or was defective because it did not conform to a representation made by its manufacturer as described in section 2307.77 of the Revised Code."  Ohio Rev. Code § 2307.73(A).  To survive summary judgment in an action brought under the OPLA, a plaintiff must establish (1) the existence of a defect in the product at issue, (2) that the defect existed at the time the product left the hands of the manufacturer, and (3) the defect was the direct and proximate cause of the plaintiff's injury.  *Hickey v. Otis Elevator Co.*, 163 Ohio App. 3d 765, 2005-Ohio-4279, 840 N.E. 2d 637, at ¶ 11 (citing *State Farm Fire & Cas. Co. v. Chrysler Corp.*, 37 Ohio St.3d 1, 11, 523 N.E. 2d 489 (1988)).

### 1.     Spoliation of Evidence

Staübli argues that Jones's OPLA claims fail because Jones cannot establish the existence of a defect in the SAF.  In response, Jones contends that he is entitled to an adverse inference of a defect based upon Staübli's spoliation of evidence—namely, Staübli unexplained disposal of the SAF at issue in this case following the Staübli Quality Department's inspection of it after the accident.  (Pl.'s Opp. 19, ECF No. 142.)  This adverse inference, argues Jones, entitles him to a presumption of a defect that allows him to overcome summary judgment.

As an initial matter, the Court notes that Jones relies solely on cases from Ohio courts to support his supposed entitlement to an adverse inference due to spoliation of evidence.  (*Id.* at 19-21.)  But as the Sixth Circuit Court of Appeals clarified three years ago, it is *federal* law, not state law, that governs spoliation issues in a case pending in federal court.  *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009).  Accordingly, this Court determines the appropriateness of an "adverse inference" based on federal law governing spoliation sanctions.

The term "spoliation" includes the destruction of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  *Owner-Operator Indep. Drivers Ass'n v. Comerica Bank*, No. 2:05-cv-56, 2012 WL 936208, at *16 (S.D. Ohio Mar. 20, 2012).  A district court has in its "inherent powers" the broad discretion to craft proper sanctions for spoliation, "'including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.'"  *Id.* (quoting *Adkins*, 554 F.3d at 651, 653).  To establish entitlement to an adverse inference instruction, Jones must establish here (1) that Staübli had an obligation to preserve it at the time it was destroyed; (2) that the evidence was destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to Jones's claim such that a reasonable trier of fact could find that it

would support that claim.  *See Beaven v. United States DOJ,* 622 F.3d 540, 553 (6th Cir. 2010).

In general, a court will not impose an adverse inference with respect to spoliated evidence unless

the party destroyed the evidence in bad faith.  *See In re Nat'l Century Fin. Enters., Inc.*

*Financial Investment Litigation*, No. 2:03-md-1565, 2009 WL 2169174, at *3 (S.D. Ohio July

16, 2009).

　　　The Court finds that there is a genuine issue of material fact with regard to whether an

adverse inference instruction is appropriate, but only as to Jones's claim of a manufacturing

defect.  As to the first prong, there is no question that Staübli had an obligation to preserve the

SAF at the time it was destroyed.  Though Staübli contends that litigation was "not reasonably

foreseeable" to it at the time the SAF was lost or destroyed, the Court finds that argument

dubious at best.  Staübli's Quality Department examined the SAF to determine why it did not

function as designed at the Mid-Ohio race, after an accident that badly injured Jones.  In the face

of such a serious accident, arising only after the SAF socket did not disconnect as it was

supposed do, it was all but obvious that litigation was within the realm of possibility.[4]

　　　The Court also finds a basis upon which to conclude that the SAF was destroyed with the

---

[4]Staübli argues in its summary judgment motion that "it did not believe that Plaintiff was injured" and lacked knowledge of the seriousness of his injuries.  (Pl.'s Mot. 11, ECF No. 156.) For this contention, Staübli relies solely on one page from the deposition of Cyril Mayeur, who was in charge of the Quality Department.  (*Id.* (citing Mayeur Dep. 24).)  But this argument is unpersuasive (if not misleading) given other evidence in the record indicating that others at Staübli knew (or were informed) that Jones was injured in the fire, that he was hospitalized, and that his injuries were severe.  Motorsports Manager Barrow, for example, who arranged for the SAF to be shipped to France for inspection by the Quality Department, circulated an e-mail to numerous Staübli employees the day after the accident, saying that Jones was "burned badly" in the accident.  (Pfeifer Dep. Ex. 1, ECF No. 153-1.)  Though the Barrow e-mail indicated Jones was expected to recover, it also noted Jones was in "critical condition" at The Ohio State University Hospital.  (*Id.*)

requisite bad faith.  Though Staübli is adamant that the SAF was disposed of inadvertently, the veracity of a spoliator's stated reasons for destroying evidence is an issue of credibility.  *Beaven*, 622 F.3d at 553 (quoting *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998)).  In this case, the SAF disappeared under mysterious circumstances even though Staübli should have been on notice that the product needed to be preserved.  At the very least, there is a legitimate question as to Staübli's culpable conduct in disposing of the SAF.  *Cf. id.* at 554 (upholding district court's finding of adverse inference when defendants were on notice of possible litigation and when destruction occurred outside the course of a regular business practice).

As to the final prong of the "adverse inference" analysis, Jones satisfies it for his claim of a manufacturing defect but not as to his claim for a design defect.  With regard to the manufacturing defect claim, the relevance of the missing evidence is obvious.  The SAF at issue in this case was forever lost, meaning that Jones never had a chance to examine it.  Thus, his experts in this litigation did not have the opportunity to inspect the SAF and assess whether there was a specific defect present in the product that may have caused it to fail on the day of the accident.

Though Staübli argues that Jones has failed to show that the missing SAF would have been "favorable" to his case, this Court disagrees with the notion that Jones necessarily has to show this to be entitled to an adverse inference instruction.  Staübli cites *In re Nat'l Century* for this proposition (*see* 2009 WL 2169174 at *12), but the Court notes that the Sixth Circuit in *Beaven* has since described the third prong differently, requiring only that a party show that a reasonable trier of fact *could* find that the missing evidence would support that party's claim. *Beaven* at 553.  In a case like this, where a defendant manufacturer has lost or destroyed the very

product at issue in a products liability case, a reasonable trier of fact could find that the missing evidence could support the party's claim simply by virtue of the fact that the trier of fact could have found the presence of a manufacturing defect had the product been preserved.  The Court rejects Staübli's approach, at least as it pertains to circumstances such as that present here, for it has the real potential of giving a defendant manufacturer an inherent advantage in litigation by having destroyed the very product alleged to have been defective.

The Court need not decide at this juncture whether the adverse inference of a manufacturing defect is warranted in this case.  For purposes of deciding the summary judgment motions before the Court, it suffices to say that Jones has a colorable claim to an adverse inference instruction at trial.  And because there is a genuine issue as to whether Jones is entitled to an adverse inference instruction, Jones has raised a genuine issue for trial with regard to the existence of a manufacturing defect.

The Court cannot say the same, however, for the design defect claim.  Even though the first two prongs of the adverse inference analysis are the same for Jones's design defect claim as they are for a manufacturing defect claim, Jones cannot satisfy the final prong when applied to his design defect claim.  It is far from obvious that the SAF that failed on the day of the accident is needed to support a claim for a *design* defect.  To prove that the SAF was defectively designed, Jones must show that "the foreseeable risks associated with its design or formulation . . . exceeded the benefits associated with that design or formulation."  Ohio Rev. Code § 2307.75(A).  The destroyed evidence (*i.e.*, the SAF) is not necessarily required to show this.  As Staübli argues, Jones can prove his design defect claim by resort to engineering drawings, design drawings, incident reports, and an exemplar SAF — all of which in combination may provide a

16

more reliable means of demonstrating to the jury a design defect than using the SAF that was used on the day of the accident.

Jones provides no reasoned argument why the destroyed evidence would have been needed to prove a design defect claim. Accordingly, Jones cannot use the possibility of an adverse inference instruction as a reason to defeat summary judgment on his OPLA claim based on a design defect theory.

### 2.   Manufacturing Defect

Under Ohio law, "[a] product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards." Ohio Rev. Code § 2307.74. Staübli argues that it is entitled to summary judgment on Jones's manufacturing defect claim because neither of Jones's experts could identify a specific defect in the SAF. Staübli cites Dr. L. Daniel Metz's testimony that the SAF *should have* disconnected but that it might *not* have been defective in manufacture. (Metz Dep. 72, ECF No. 116.) Staübli also points to testimony from Dr. Carl Abraham, who testified that it is "irrelevant" what caused the SAF's failure to disconnect in this case and in similar instances of SAF failure. (Abraham Dep. 95-96, ECF No. 117.) Without ruling out any of the "numerous other possible causes" of the SAF's failure to disconnect in this case, Staübli argues that Jones's experts have failed to create a genuine issue of material fact for trial.

The Court has already found that a genuine issue for trial exists with regard to a manufacturing defect because of the possible adverse inference that arises from Staübli's loss or

17

destruction of the product at issue.  Even if the adverse inference were not in play, however, the Court disagrees with Staübli and finds sufficient circumstantial evidence of a manufacturing defect to enable Jones to escape summary judgment.  The OPLA expressly provides that a claimant may support a claim of defect with circumstantial evidence.  Ohio Rev. Code § 2307.73(B).  In this case, the most obvious circumstantial evidence before the Court is the universally held view that the SAF socket should have disengaged when Jones released the handles.  The SAF was designed to require the refueler only to release the handles, which in turn would release the spring loaded socket from the plug on the car.  Jones testified that the SAF would not release when he released the handles multiple times, evidencing the fact that the SAF did not operate properly at the time of the accident.  There is also testimony in the record from, among others, Staübli's design engineer (Mr. Tiberghien), Staübli's motorsports manager (Mr. Barrow), and Jones's expert (Dr. Metz) confirming that the SAF, if working properly and as designed, should have merely required Jones to release the handles in order to decouple the refueling socket from the plug at the time of the accident.  This evidence of unsafe, unexpected performance by the product in question is sufficient to infer the existence of a manufacturing defect.  *State Farm Fire & Cas. Co.*, 37 Ohio St. 3d at 6, 523 N.E. 2d 489.

There is also evidence in the record to create the reasonable inference that a manufacturing defect was present at the time the product left Staübli's control.   The report prepared by Staübli's Quality Department after analysis of the SAF that failed on the day of the accident showed no components missing from the socket or plug.  (Canovas Dep. Ex. 4, ECF No. 149-5.)  Nor were there any "external" parts found inside the socket or plug.  (*Id.*)  The Quality Department's report also indicated that the SAF had "no particular findings or damage

on other components." (*Id.*) At the very least, these findings by Staübli's Quality Department are enough to raise the inference that the product was substantially the same as it was when it left Staübli's control, meaning that a jury could conclude that the defect (if any) was present when the product left Staübli's hands.

Despite the circumstantial evidence suggesting a genuine issue of fact with regard to the presence of a manufacturing defect, Staübli argues that Jones cannot rely on circumstantial evidence to overcome summary judgment. According to Staübli, a plaintiff cannot rely on circumstantial evidence to prove a defect unless he has first shown "why the defendant's product should not be among the possible causes to be eliminated." (Def.'s Reply 2, ECF No. 156.) Citing *Yanovich v. Zimmer Austin, Inc.*, 255 F. App'x 957, 966 (6th Cir. 2006), Staübli argues that circumstantial evidence of a defect is permitted only after a plaintiff introduces evidence that either (1) eliminates some of the other possible causes of the injury, or (2) establishes that a defect-free product would not have performed the way the product at issue performed. (*Id.*) Notably, these prongs are in the *disjunctive*: a plaintiff may introduce evidence of *either* of them to satisfy the prerequisite to using circumstantial evidence. *Yanovich* at 966.

Contrary to Staübli's position, Jones has cleared this hurdle to using circumstantial evidence. At the very *least*, Jones satisfies the second prong. The testimony of both Jones's experts and Staübli's engineers all but definitively establish that a defect-free SAF would have enabled Jones to easily decouple the socket from the plug by simply releasing pressure on the handles. Thus, there is evidence that a defect-free product would not have performed (or, more accurately, failed to perform) as the SAF did in this case. Jones is therefore entitled to rely on circumstantial evidence. And in this case, the circumstantial evidence relied upon by Jones

19

precludes summary judgment.  *Cf. Pearce v. Fouad*, 146 Ohio App. 3d 496, 2001-Ohio-3986, 766 N.E. 2d 1057, at ¶ 41 (2001) (finding sufficient circumstantial evidence of a product defect to support a jury verdict for liability when there was evidence that a fire would not have occurred if the device at issue had conformed to the manufacturer's specifications).

For these reasons, the Court finds that genuine issues of material fact exist with respect to whether a manufacturing defect was present in the SAF.  Staübli's argument that Jones has not established a triable issue with respect to the presence of a manufacturing defect is not well taken.

### 3.      Design Defect

Under Ohio Rev. Code § 2307.75, a product is defective in design "if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation . . . exceeded the benefits associated with that design or formulation."  Ohio Rev. Code § 2307.75(A).  Staübli argues that summary judgment is appropriate because Jones cannot show that the SAF was defective in its "design or formulation" at the time the product left Staübli's control.  Staübli argues that neither of Plaintiff's experts (Dr. Metz and Dr. Abraham) reviewed the design and engineering drawings of the SAF or disassembled an exemplar SAF; thus, Staübli argues that they cannot opine about any design defect.  (Def.'s Mot. 15, ECF No. 120.)  Staübli further argues that Dr. Metz "candidly testified" that the SAF might not have been defective in design.  (*Id.*)

To show a genuine issue of material fact on his design defect claim, Jones emphasizes the design changes that Staübli made to its product, changes that the company implemented before the accident but were not incorporated into the SAF that failed in this case.  Specifically, Jones

points to evidence that Staübli redesigned the "balls and memories" in the SAF, after which (according to Jones) the number of incidents or complaints of the SAF "jamming" dropped. (Pl.'s Opp. 16, ECF No. 142.)  Jones argues that the design changes to the "balls and memories," coupled with the reduced number of incidents or complaints by customers using the Staübli SAF, allow for an inference that the previous design was defective.  (*Id.*)

Although it is often necessary for a plaintiff asserting a design defect claim to present expert testimony in support of that claim, expert testimony is not always required to prove the material elements of a design defect claim. See *Atkins v. GMC*, 132 Ohio App. 3d 556, 564, 725 N.E.2d 727 (1999).  Where the claim involves a simple device without any complex features or designs, circumstantial evidence may be sufficient to establish that a defect existed.  *Id.*  On the other hand, a plaintiff's claim of a design defect in a complex product will require expert testimony to support the claim.  *See Newell Rubbermaid, Inc. v. Raymond Corp.*, No. 5:08-cv-2632, 2010 U.S. Dist. LEXIS 65564, at *43-44 (N.D. Ohio July 1, 2010), *aff'd*, 676 F.3d 521 (6th Cir. 2012).  In this case, based upon the testimony in the record from Plaintiffs' experts and Staübli's engineers, the Court concludes that the SAF is sufficiently complex such that expert testimony is required to support a design defect claim.

Jones's opposition to summary judgment does not rely on a specific design defect identified by either one of its liability experts (Dr. Metz and Dr. Abraham).  For his design defect claim, Jones relies exclusively upon the evidence that Staübli modified the "balls" and "memories" components of the SAF.  (Pl.'s Opp. 15-16, ECF No. 142.)  Staübli's witnesses testified, however, that the modification to the balls and memories had nothing to do with the disconnection of the socket from the plug.  Rather, the modification of the memories was related

21

to the *connection* sequence and had no mechanical effect on the *dis*connection function of the SAF.  (Canovas Dep. 47, ECF No. 149; Durieux Dep. 27-28, ECF No. 151; Mayeur Dep. 40, ECF No. 152.)  And the modification of the "balls" was simply to change the material used in order to speed up the maintenance process.  (Durieux Dep. 29.)

Jones does not cite testimony from an engineer or other expert to rebut Staübli's contention that the modification to the memories and balls was unrelated to the disconnection sequence.  Jones is simply asking the Court to allow a jury to speculate that the memories and balls had some impact upon the socket's failure to disconnect on the date of the accident.  *See Hickey*, 163 Ohio App. 3d at 771 (affirming summary judgment when it would have been speculative for a jury to conclude that the plaintiff's theory of design defect caused his injuries); *see also Utz v. Howmedica Osteonics Corp.*, No. 1:06-cv-1973, 2009 U.S. Dist. LEXIS 123973, at *24-27 (N.D. Ohio Mar. 31, 2009) (granting summary judgment on design defect claim when plaintiffs' expert testimony did not support the conclusion plaintiffs sought to offer).  Thus, Jones has not created a genuine issue of material fact with regard to a design defect.  Staübli is therefore entitled to summary judgment on Jones's design defect claim.

### 4.    Failure to Conform to Representation

The OPLA also provides for liability when a product does not conform to representations made by the manufacturer.  Specifically, Ohio Rev. Code § 2307.77 provides:

> A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer. A product may be defective because it did not conform to a representation even though its manufacturer did not act fraudulently, recklessly, or negligently in making the representation.

Jones's Amended Complaint referenced a "failure to conform" theory, alleging that the SAF failed to live up to "Staübli's claims in its catalogue for this product that the design of the

22

fuel probe or co-axial socket prevents any jamming during connection to or disconnection from the plug or buckeye." (Am. Compl. ¶ 36, ECF No. 48.) Indeed, in marketing literature, Staübli described the SAF as featuring a "[s]afe and reliable connection" and being "easy to operate." (Pl.'s Appx. Exh. 2, ECF No. 147-2.) The literature also emphasized the Staübli's socket design "prevents any jamming during connection to or disconnection from the plug." (*Id.*) The literature also touted that the product featured a "dead man's principle,"[5] which suggested an ease of operation, particularly with respect to stopping the flow of fuel and disconnecting the socket from the plug. Jones contends that the SAF in this case failed to conform to these representations, as evidenced by his inability to decouple the socket from the plug during the incident at issue.

Just as the failure of the socket to disconnect from the plug at the time of the accident is circumstantial evidence of a manufacturing defect (as explained above), it is likewise evidence that the product did not conform to the representations made in the Staübli literature. Staübli does not address this theory of liability in either its motion for summary judgment or its reply to Jones's opposition. Accordingly, this theory of liability under the OPLA remains available for Jones to pursue at trial.

### 5. Failure to Warn

The OPLA also provides that a product may be defective "due to inadequate warning or instruction." Ohio Rev. Code § 2307.76(A). Jones argues that Staübli "ignores" his "failure to warn" theory in its motion for summary judgment and that he may therefore proceed to trial, at

---

[5]Plaintiff's expert described the "dead man's principle" in mechanical engineering: "If the operator is no longer able to operate the equipment . . . the equipment will do the correct thing by itself." (Metz Dep. 43, ECF No. 116.)

the very least, on that theory of liability.  (Pl.'s Opp. 21, ECF No. 142.)  In its reply brief, Staübli

contends that Jones did not bring a claim for "failure to warn" in his complaint and that such a

claim is therefore not part of Jones's case.  (Def.'s Reply 12, ECF No. 156.)  Staübli is correct.

Count 1 of Jones's Amended Complaint, alleging a claim under the OPLA, alleged the

following as against Staübli—

> 36.   The Staübli Advanced Filling System, including the SAF45 Dry-Break
> Fuel Filling Valve and its components, malfunctioned on July 19, 2008, in that Keith
> [Jones] as unable to disconnect the fuel probe from the buckeye mounted on the car,
> which resulted in the fuel leak or spill described above when the fuel probe or the
> hoses attached to it broke, *despite Staübli's claims in its catalogue for this product
> that the design of the fuel probe or co-axial socket prevents any jamming during
> connection to or disconnection from the plug or buckeye*, and despite Staübli's
> claims in its catalogue for this product that the clean-break, non-spill design prevents
> leaks and spillage while connecting or disconnecting.  Such malfunctions of the
> Staübli Advanced Filling System *resulted from the defective design or manufacture
> of Staübli's products that made them in a defective condition unreasonably
> dangerous to the ultimate user or consumer*, here Keith.  The *defective design and
> manufacture* of Staübli's products may have been contributed to by various John Doe
> defendants.
> . . .
>
> 38.   The defective condition of the products of Staübli . . . proximately
> caused Keith's severe injuries and substantial damages as described herein.
> Defendants are liable for all injuries and harm caused by their defective products as
> alleged herein, under principles of Strict Tort Liability (Restatement 2nd, Sec. 402A)
> and Products Liability Law, Ohio Revised Code Sec. 2307.71 – 2307.80.

(Am. Compl. ¶¶ 36, 38, ECF No. 48 (emphasis added).)  As the emphasized portion of paragraph

36 shows, Jones expressly alleged theories of a manufacturing defect, a design defect, and a

failure of the product to conform with representations made by Staübli.  Thus, the allegations

against Staübli, as indicated in paragraph 36, gave notice pleading of Jones's intent to invoke

Ohio Rev. Code §§ 2307.74, 2307.75, and 2307.77.  Nowhere in the product liability allegations

against Staübli, however, does Jones reference a "failure to warn" or otherwise indicate an intent

24

to proceed under a theory that the SAF was defective for failure to provide adequate warning or instruction.

For his part, Jones argues that a "failure to warn" theory of liability is on the table because he "specifically incorporated as part of its allegations the Ohio Products Liability Act and all of its provisions, which includes [Ohio Rev. Code] § 2307.76, whereby a product can be defective solely due to inadequate warnings or instructions."  (Pl.'s Opp. 21-22, ECF No. 142.) But Jones's sweeping reference to the entirety of the OPLA— paragraph 38 of the Amended Complaint cites "Ohio Revised Code Sec. 2307.71 – 2307.80"—hardly gives notice of a "failure to warn" theory of liability, particularly in view of the fact that his substantive allegations failed to allege any facts with respect to an inadequate warning and the impact of any allegedly inadequate warning upon the events giving rise to Jones's claim for relief.  *Cf. Boroff v. Alza Corp.*, 685 F. Supp. 2d 704, 708 (N.D. Ohio 2010) (finding plaintiff's manufacturing defect claim inadequately pleaded when the complaint was bereft of any factual allegation that the product failed to conform with any design specification, formula, or performance standard). Accordingly, the Court does not consider Jones's Amended Complaint to include an OPLA claim based on a failure to warn.  Simply put, a "failure to warn" theory of liability is not part of Jones's case.

## C.    Causation

Staübli also argues that it is entitled to summary judgment because "unforeseeable intervening acts" prevent any defect from being the proximate cause of Jones's injuries.  (Def.'s Mot. 13, ECF No. 120.)  Specifically, Staübli cites as a series of "unforeseeable" intervening causes that (1) the SAF socket would fail to disconnect; (2) pit crew manager and lollipop

operator would position themselves such that they could not observe the SAF; (3) the pit crew would react to Jones's motion pulling away from the car instead of ensuring the socket was disconnected; (4) the pit crew would signal the driver to leave before ensuring that Jones had disconnected the SAF socket; (5) the pit crew would fail to stop the car once the SAF socket failed to disconnect; (6) Jones would run alongside the car attempting to remove the SAF socket after the car pulled away; (7)  the fuel hose would break and spill fuel onto Jones; (8) the car's exhaust would ignite the fuel; (9) Jones would become engulfed in flames; and (10) Jones would not wear "full fire-resistant clothing" (*i.e.*, his gloves and shoes were not fire-resistant).  (Def.'s Mot. 14, ECF No. 120; Def.'s Reply 13-14, ECF No. 156.)

It cannot be seriously denied that the failure of the SAF to disconnect from the plug, as it was designed to do, has "some reasonable connection" to the injuries that Jones suffered.  *See Queen City Terminals v. Gen. Am. Transp. Corp.*, 73 Ohio St. 3d 609, 618, 653 N.E. 2d 661 (1995).  And though it is true that an intervening act may break the chain of causation flowing from a defendant's culpable conduct, a defendant will not escape liability if the intervening cause was reasonably foreseeable.  *Id.*  "The test used to determine foreseeability of the intervening cause to the original negligent actor is 'whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor.'" *Id.* at 619-20 (quoting *Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155, 160, 451 N.E.2d 815 (1983)).  When reasonable minds might differ as to the foreseeability of a particular risk or the character of an intervening cause, the issue must go to the jury.  *Aetna Caves. & Ins. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 543 (6th Cir. 2000) (quoting *Ohio Fair Plan Underwriting*

26

*Ass'n v. Arcara*, 65 Ohio App. 2d 169, 417 N.E.2d 115, 120 (1979)).

The Court is not persuaded by Staübli's "intervening cause" argument. Much of what Staübli identifies as part of a chain of intervening causation are actions inherent in the frenetic environment of a pit stop in a professional racing series auto race. For example, it is hardly surprising that a pit crew seeks to complete the car's pit stop as quickly as possible in order to return the car to the race track. Toward that end, it is hardly surprising that a pit crew would time the release of the car from the pit to some movement of the refueler indicating that the refueling process was complete. Indeed, there is evidence in the record to suggest that pit crews relied upon the quick release feature of the Staübli SAF system for this reason: they could time the release of the car to the movement of the fueler away from the car because of the knowledge that the SAF socket decoupled from the plug so easily. Thus, it is dubious at best to view the pit crew's actions in this case — and the events that followed it — as an "intervening cause" to break the chain of causation.

Nor does the Court view the fact that Jones did not wear fire-resistant gloves or shoes as an intervening cause that absolves Staübli from liability as a matter of law. Though Staübli argues adamantly that the failure to wear "full" fire-resistant clothing (*i.e.*, including shoes and gloves) was a violation of IMSA rules, the testimony in the record was equivocal on that point. Though IMSA regulations specified fire-resistant clothing, the failure to do so did not result in penalties to the race teams or their members. (Elkins Dep. 46-47, 106-07, ECF No. 138.) Further, a reasonable trier of fact could find it foreseeable that a refueler would not wear the fire resistant gloves, as Jones testified that such gloves were bulky and, in his view, did not allow him to operate the SAF properly. (Jones Dep. 129, ECF No. 118.)

27

Proximate cause is generally a question of fact that is exclusively within the province of the jury. *Wade v. Diamant Boart, Inc.*, 179 F. App'x 352, 358 (6th Cir. 2006) (citing *Sigman v. General Elec. Co.*, 77 Ohio App. 3d 430, 602 N.E. 2d 711, 713 (1991)). Staübli's "intervening cause" arguments fall far short of disturbing that basic principle. Summary judgment based on the "intervening cause" is inappropriate.

### D. Negligence, Gross Negligence, and Willful and Wanton Misconduct

In addition to claims brought under the OPLA, Jones's Amended Complaint alleges claims for negligence, gross negligence, and willful and wanton misconduct against Staübli. (Third Am. Compl., ¶¶ 39-42, 59-64, ECF No. 48.) Staübli argues that summary judgment must be granted on these claims for relief because they are abrogated as a matter of Ohio substantive law by the OPLA. (Def.'s Mot. 16-17, ECF No. 120.) Indeed, the OPLA provides expressly that the it is "intended to abrogate *all* common law product liability claims or causes of action." Ohio Rev. Code § 2307.71(B) (emphasis added); *see also Miller v. Alza Corp.*, 759 F. Supp. 2d 929, 943 (S.D. Ohio 2010).

In response, Jones concedes that his common law claims are barred by the OPLA and that summary judgment is therefore appropriate on those claims. Accordingly, the Court grants summary judgment to Staübli on Count 2 (negligence) and Count 7 (gross negligence, willful and wanton misconduct) of the Amended Complaint.

### IV. Discussion — Federal Insurance's Lawsuit (Case No. 2:10-cv-37)

Staübli also moves for summary judgment on Federal's Third Amended Complaint. As against Staübli, Federal asserts (1) claims under the OPLA (First Claim for Relief), a claim for misrepresentation (Second Claim), and (3) a common-law claim for negligence, gross

negligence, and/or recklessness (Third Claim).  (Third Am. Compl., ¶¶ 30-46, ECF No. 75 in

Case No. 2:10-cv-37.)  Though many of the arguments in the briefing on Staübli's motion for

summary judgment in Federal's case are the same as those raised in Jones's case, the Federal

lawsuit includes some theories of relief that are not present in Jones's case.

      **A.**      **Federal's OPLA Claims for Relief**

Just like Jones, Federal asserts a claim for relief for product liability under the OPLA.

And just like Jones, Federal alleges a manufacturing defect claim, a design defect claim, and a

claim that Staübli's SAF did not conform to representations Staübli made.  (*Id.* at ¶¶ 32-33, 35

(citing Ohio Rev. Code §§ 2307.74, 2307.75, and 2307.77).)

      **1.**      **Manufacturing Defect and Design Defect Claims.**

For the same reasons set forth above in the analysis of Jones's product liability claims,

genuine issues of material fact exist with regard to OPLA liability under a manufacturing defect

theory.  Summary judgment on Federal's claim based on Ohio Rev. Code §§ 2307.74 is therefore

denied.  The Court grants summary judgment, however, on Federal's design defect claim under

Ohio Rev. Code § 2307.75; Federal's design defect claim fails as a matter of law for the same

reasons set forth above with respect to Jones's design defect claim.

      **2.**      **Failure to Conform to Representations**

Federal also asserts an OPLA claim under Ohio Rev. Code § 2307.77, contending that

Staübli's product failed to conform to representations made in Staübli's literature.  Unlike in its

summary judgment motion on Jones's Amended Complaint, Staübli moves for summary

judgment on this claim in Federal's case.  (Def.'s Mot. 17, ECF No. 106 in Case No. 2:10-cv-

37.)  Specifically, Staübli argues that (1) there is no evidence that the SAF failed to conform to

the representations in the marketing brochure and (2) there is no evidence of reliance upon the representations in that brochure.  (*Id.* at 17-18.)

The Court concludes that Federal raises a genuine issue of material fact on the Ohio Rev. Code § 2307.77 theory of liability.  Though Federal's opposition to summary judgment does not squarely address the elements of an OPLA claim based upon Ohio Rev. Code § 2307.77, Federal argues (as did Jones) that Staübli's spoliation of evidence gives rise to an inference of a defect and therefore defeats summary judgment on the OPLA claims.  (Pl.'s Opp. 2-3, ECF No. 116 in Case No. 2:10-cv-37.)  Just as the Court found that the possibility of an adverse inference precludes summary judgment on a manufacturing defect claim, the same is true as to Federal's OPLA claim brought under a theory that the SAF failed to conform to Staübli's representations. And as to the reliance element, there is evidence in the record that Jones and the de Ferran Motorsports team relied on the quick release feature of the SAF, such that they timed the release of the race car from the pit area based upon the movement of the fueler away from the car. Accordingly, summary judgment is denied as to Federal's OPLA claim brought under Ohio Rev. Code § 2307.77.

### 3.    Failure to Warn

Unlike Jones's Amended Complaint in his lawsuit, Federal's Third Amended Complaint expressly alleges an OPLA claim under a "failure to warn" theory under Ohio Rev. Code § 2307.76.  (Third Am. Compl. ¶ 34.)  Staübli argues it is entitled to summary judgment on this theory of relief because the only conceivable dangers to be warned of were "open and obvious" within the meaning of Ohio Rev. Code § 2307.76(B).  (Def.'s Mot. 16, ECF No. 106 in Case No. 2:10-cv-37.)  Section 2307.76(B) provides that a product is *not* defective due to inadequate

warning when the manufacturer fails to warn "about an open and obvious risk or a risk that is a matter of common knowledge."

Federal's response in opposition to Staübli's summary judgment motion does not specifically respond to Staübli's argument with respect to the "failure to warn" theory of OPLA liability. Though Federal states in conclusory fashion that "questions of fact exist" with regard to Staübli's failure to provide adequate warning or instruction regarding the use of the SAF, Federal provides no substantive argument responding to Staübli's legal argument as to why the "failure to warn" theory fails. By failing to respond to Staübli's argument, Federal has failed to meet its burden of establishing a genuine issue for trial on a "failure to warn" theory of product liability under the OPLA. *Stackhouse v. Forward Air, Inc.*, No. 2:07-cv-1241, 2009 U.S. Dist. LEXIS 23616, at *14 (S.D. Ohio Mar. 20, 2009) (finding plaintiff failed to meet burden of establishing essential element of her claim for relief when she failed to respond to defendant's summary judgment argument). Staübli is therefore entitled to summary judgment on Federal's OPLA claim based on a "failure to warn" theory under Ohio Rev. Code § 2307.76.

### B. Common Law Claims

Similar to Plaintiff Jones, Federal also alleged a common law claim for relief sounding in negligence, gross negligence, and/or recklessness. Just as it did with regard to Jones's claim, Staübli moves for summary judgment on Federal's common law claims on the basis that they are abrogated by the OPLA. Federal does not address this argument in its opposition to summary judgment. For the same reasons set forth above in the analysis of Jones's claim, the Court grants summary judgment in Staübli's favor on Federal's claims of negligence, gross negligence, and/or recklessness: these claims are precluded by the OPLA. *See* Ohio Rev. Code § 2307.71(B).

31

### C.    Misrepresentation

In the second claim for relief in its Third Amended Complaint, Federal also alleges a claim for "misrepresentation," under a theory that Jones relied to his detriment upon Staübli's representation that it would fix the problem that caused the fuel probe to jam for Jones during a practice session in 2007.  (Third Am. Compl. ¶¶ 38-39.)  Staübli argues that this claim is abrogated by the OPLA and that, in any event, there is no evidence of an affirmative "representation" upon which to base a misrepresentation claim.  (Def.'s Mot. 18-19, ECF No. 106 in Case No. 2:10-cv-37.)

Federal's response in opposition to summary judgment did not respond to Staübli's argument for summary judgment on the misrepresentation claim.  Thus, Federal has not come forward with evidence or argument to meet its Rule 56 burden of showing a genuine issue of fact for trial on this claim.  The Court therefore grants summary judgment in Staübli's favor on Federal's second claim for relief.

### V.    Conclusion

For the reasons set forth above, Staübli's motions for summary judgment (ECF Nos. 120 in Case No. 2:09-cv-1120 and ECF No. 106 in Case No. 2:10-cv-37) in the consolidated cases are each **GRANTED IN PART AND DENIED IN PART**.  Summary judgment is **DENIED** as to the OPLA claims of both Plaintiffs, insofar as they are based on theories of a manufacturing defect under Ohio Rev. Code § 2307.74 and a defect for failure to conform with representations under Ohio Rev. Code § 2307.77.  These claims shall proceed to trial.

Staübli's motions for summary judgment as to Plaintiffs' OPLA claims of a design defect under Ohio Rev. Code § 2307.75 and for liability on a "failure to warn" theory under Ohio Rev.

Code § 2307.76 are **GRANTED.**  Summary judgment is also **GRANTED** in Staübli's favor on Plaintiffs' common law claims sounding in negligence, gross negligence, willful and wanton misconduct, and/or recklessness and on Plaintiff Federal's misrepresentation claim.

      **IT IS SO ORDERED.**

                       **/s/ Gregory L. Frost**          
                       **GREGORY L. FROST**
                       **UNITED STATES DISTRICT JUDGE**